# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| **FILED** | |
| **CLERK, U.S. DISTRICT COURT** | |
| **2/15/2023** | |
| **CENTRAL DISTRICT OF CALIFORNIA** | |
| BY: ___ CD ___ DEPUTY | |

In the Matter of the Search of )
*(Briefly describe the property to be searched or identify the person by name and address)* )
)
2539 E 129th Street, Compton, CA ("SUBJECT )
PREMISES 1"), as described in Attachment A-1. )
)
)

Case No.   2:23-mj-00747-DUTY

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

> See Attachment A-1

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

> See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(a)(1)(A) | Dealing in Firearms Without a License |
| 18 U.S.C. § 933 | Trafficking in Firearms |
| 26 U.S.C. § 5861(a) | Unregistered Dealing in Firearms |
| 26 U.S.C. § 5861(d) | Possession of an Unregistered Firearm |
| 26 U.S.C. § 5845 | Possession of a Short-Barreled Rifle |
| 18 U.S.C. § 371 | Conspiracy |

The application is based on these facts:

> See attached Affidavit

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*/s/ George Poor*

_____
*Applicant's signature*

George Poor, ATF Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   February 15, 2023
_____

_____
*Judge's signature*

City and state: Los Angeles, CA_____

Hon. Maria A. Audero, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: David C. Lachman (x5564)

**ATTACHMENT A-1**

PREMISES TO BE SEARCHED

    The premises to be searched is located at 2539 E 129th Street, Compton, California 90222 ("SUBJECT PREMISES 1"). SUBJECT PREMISES 1, as depicted in the photographs below, is a residence with pink exterior walls with brown trim and includes multiple outbuildings behind the primary structure.  The number "2539" is affixed to the left of the front door.







**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 922(a)(1)(A) (Engaging in the Business of Dealing in Firearms and Manufacturing Firearms Without a License), 18 U.S.C. § 933 (Trafficking in Firearms), 26 U.S.C. § 5861(a) (Engaging in the Unregistered Business of Manufacturing or Dealing in Firearms), 26 U.S.C. § 5861(d) (Possession of an Unregistered Firearm), 26 U.S.C. § 5845 (Possession of a Short-Barreled Rifle), and 18 U.S.C. § 317 (Conspiracy) (the "Subject Offenses"), namely:

    a.   Firearms or ammunition;

    b.   Glock switches;

    c.   Silencers;

    d.   Items related to the manufacture of firearms, including drills, drill presses, firearm templates, instructions for manufacturing firearms, Polymer80 firearm parts and kits, jigs, and jig frames;

    e.   Any documents and records relating to purchasing or selling firearms or ammunition on Instagram;

    f.   Records, documents, programs, applications, materials, or conversations relating to the sale or purchase of guns or ammunition, including correspondence, receipts, records, and documents noting prices or times when guns or ammunition were bought, sold, or otherwise distributed;

    g.   Records, documents, programs, applications, materials, or conversations relating to sources of supply of

i

firearms, or firearms customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when firearms or ammunition were possessed, bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

h.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

i.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

j.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Instagram, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

ii

k.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of guns or ammunition;

l.   Contents of any calendar or date book;

m.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

n.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

o.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii.   applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.   records of or information about Internet Protocol addresses used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal

digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.   **SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.   In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.    The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.

Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.     During the execution of this search warrant, law enforcement is permitted to: (1) depress Moises SOLIS's and Alejandro Almaguer MONTES's thumb- and/or fingers onto the fingerprint sensor of the digital device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of Moises SOLIS's and Alejandro Almaguer MONTES's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

7.     The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, George H. Poor, being duly sworn, declare and state as follows:

### I.   PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint and arrest warrant against MOISES SOLIS ("SOLIS") for a violation of 18 U.S.C. § 922(a)(1)(A): Engaging in the Business of Dealing in Firearms Without a License.

2.   This affidavit is also made in support of an application for warrants to search the following:

a.   2539 E 129th Street, Compton, California 90222 ("SUBJECT PREMISES 1") as described more fully in Attachment A-1;

b.   400 W Plum Street, Compton, California 90222 ("SUBJECT PREMISES 2") as described more fully in Attachment A-2;

c.   13310 S Willowbrook Avenue, Compton, California 90222 ("SUBJECT PREMISES 3") as described more fully in Attachment A-3;

d.   A cellular telephone issued by T-Mobile, Inc., bearing IMSI 310260662225484, and phone number 562-200-6678 (the "SUBJECT DEVICE"), as further described in Attachment A-4;

e.   A silver Mercedes C300 sedan bearing California license plate number 9ABX232 ("SUBJECT VEHICLE 1"), as further described in Attachment A-5;

   f. A white Chevrolet Silverado pickup truck bearing California license plate number 54278J3 ("SUBJECT VEHICLE 2"), as further described in Attachment A-6;

   g. The person of SOLIS, as described more fully in Attachment A-7; and

   h. The person of Alejandro Almaguer Montes ("MONTES"), as described more fully in Attachment A-8.

  3. The requested search warrants seek authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 922(a)(1)(A) (Engaging in the Business of Dealing in Firearms and Manufacturing Firearms Without a License), 18 U.S.C. § 933 (Trafficking in Firearms), 26 U.S.C. § 5861(a) (Engaging in the Unregistered Business of Manufacturing or Dealing in Firearms), 26 U.S.C. § 5861(d) (Possession of an Unregistered Firearm), 26 U.S.C. § 5845 (Possession of a Short-Barreled Rifle), and 18 U.S.C. § 317 (Conspiracy) (the "SUBJECT OFFENSES"), as described more fully in Attachment B. Attachments A-1 through A-8 and B are incorporated herein by reference.

  4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrants, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and

statements described in this affidavit are related in substance and in part only.

## II.  <u>BACKGROUND OF AFFIANT</u>

5.    I am a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and have been since July 2019.  I am currently assigned to the Los Angeles Field Division, where I participate in investigations involving, among other federal offenses, prohibited persons possessing firearms, persons trafficking firearms and controlled substances, and persons possessing illegal firearms.  I have also participated in investigations focusing on gang activity.

6.    During my time as an ATF Special Agent in the Los Angeles Field Division, I have participated in multiple ATF operations with federal joint task forces and local police involving the investigation of violations of firearms and narcotics laws.  I have completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center and Special Agent Basic Training at the ATF National Academy.  I have also received specialized trainings in surveillance, interviewing, warrant writing, evidence handling, arrest procedures, search procedures, and testifying in court.

7.    Prior to becoming an ATF Special Agent, I was a police officer with the Washington, D.C., Metropolitan Police Department for approximately two years and eight months.  During that time, I participated in dozens of investigations regarding

violent crime, illegal narcotics, and illegal possession of firearms.

### III. SUMMARY OF PROBABLE CAUSE

8.    Over the course of twelve controlled transactions, between August 2022 and January 2023, SOLIS sold a total of 24 firearms, assorted ammunition, and a firearm silencer to individuals whom SOLIS believed to be firearms customers but who in fact were undercover ATF agents ("UCs").  Unless stated otherwise, the controlled transactions were audio and video recorded.  Some of the firearms SOLIS sold were short-barreled rifles and some were privately manufactured "ghost guns" bearing no manufacturer markings or serial numbers.

9.    All twelve firearms transactions took place in front of or in the vicinity of SUBJECT PREMISES 1 on E 129th Street in Compton, California.  Here, SOLIS met with UCs either inside or at the UCs' car to sell firearms to the UCs.

10.    Throughout this investigation, SOLIS utilized the SUBJECT DEVICE to communicate with the UCs regarding firearms sales, send pictures and prices of firearms to the UCs, and arrange meeting times and locations for the firearms sales from approximately August 22, 2022, to February 12, 2023.

11.    For some of the transactions, SOLIS was aided by MONTES, whom SOLIS identified as his cousin.  MONTES provided a Kimber pistol to SOLIS on January 5, 2023, which SOLIS sold to the UCs.  During controlled transactions on January 5, 2023, MONTES accompanied SOLIS around the Compton area to retrieve firearms that were later sold to UCs.  In addition, on October

4

5, 2022, SOLIS arrived at SUBJECT PREMISES 1 in SUBJECT VEHICLE 2, which is registered to MONTES, and exited the passenger side of the vehicle carrying a brown cardboard box, which contained a pistol with two magazines, a silencer, and approximately 75 rounds of ammunition.

12.  On at least ten occasions from October 2022 through January 2023, SOLIS either retrieved firearms from SUBJECT PREMISES 1 or returned with additional firearms to sell to the UCs after traveling to SUBJECT PREMISES 2 and 3:[1]

a.  **SUBJECT PRESISES 1:**  On at least four occasions from October 2022 to January 2023, SOLIS retrieved firearms from the rear of SUBJECT PREMISES 1, which SOLIS then sold to the UCs in front of or near SUBJECT PREMISES 1.  SOLIS resides at SUBJECT PREMISES 1.  SUBJECT VEHICLE 1, which SOLIS stated he prefers to drive when transporting firearms, has been observed at SUBJECT PREMISES 1 on multiple occasions in January and February 2023.  Based on surveillance, SOLIS was observed entering and exiting the front door of SUBJECT PREMISES 1 multiple times in the early morning hours on February 2, 2023, including to discard trash.  According to phone location data, the SUBJECT DEVICE has been in close proximity to SUBJECT PREMISES 1 during the early morning hours from February 8, 2023, to February 15, 2023.[2]

---

[1] SUBJECT PREMISES 2 and 3 are both under approximately two miles by car from SUBJECT PREMISES 1 according to Google Maps.

[2] On February 7, 2023, the Honorable Pedro V. Castillo, United States Magistrate Judge, issued a warrant authorizing the collection of prospective phone location data for the SUBJECT DEVICE, which began on February 8, 2023.

b.   **SUBJECT PREMISES 2:**  MONTES, who possessed at
least one firearm SOLIS sold to the UCs and assisted SOLIS
during several of the transactions, resides at SUBJECT PREMISES
2.[3]  In addition, on January 5, 2023, SOLIS stated MONTES was
selling a Kimber pistol for $1,800 and that SOLIS could retrieve
it from "around the corner."  After the UCs agreed to purchase
the Kimber pistol, SOLIS and MONTES went to SUBJECT PREMISES 2
in SUBJECT VEHICLE 1, MONTES entered SUBJECT PREMISES 2 for
about a minute, and MONTES then got back into SUBJECT VEHICLE 1.
Less than ten minutes later, SOLIS sold the Kimber pistol to the
UCs for $1600 after telling the UCs that he negotiated a lower
price with MONTES.

c.   **SUBJECT PREMISES 3:**  On at least five occasions,
and as recently as January 5, 2023, SOLIS traveled to SUBJECT
PREMISES 3 after agreeing to retrieve more firearms to sell to
the UCs and returned with additional firearms.  On these
occasions, SOLIS was observed by law enforcement either walking
through the front security gate of SUBJECT PREMISES 3 or
vehicles SOLIS was believed to be driving entered through the
security gate and drove down the driveway of SUBJECT PREMISES 3
onto the property.  Throughout this investigation, SOLIS has
repeatedly referenced an unknown subject as his builder or
manufacturer of AR-style, "ghost gun" firearms.  Based on

---

[3] MONTES was surveilled leaving SUBJECT PREMISES 2 with a
child during the morning of February 6, 2023.  SUBJECT VEHICLE 2
is registered to MONTES at SUBJECT PREMISES 2, and the phone
number believed to be used by MONTES is subscribed to SUBJECT
PREMISES 2 as of January 6, 2023.  According to California
Department of Motor Vehicles ("DMV") records, MONTES's address
of record is SUBJECT PREMISES 2.

surveillance, analysis of toll record and SOLIS's statements to UCs, all further described below, I believe this individual resides at or is operating out of SUBJECT PREMISES 3.[4]

13.   During this investigation, SOLIS and/or MONTES have used SUBJECT VEHICLE 1 and SUBJECT VEHICLE 2 to transport firearms that were later sold to the UCs:

a.   **SUBJECT VEHICLE 1**: On at least two occasions on January 5, 2023, SOLIS transported firearms in SUBJECT VEHICLE 1 which were later sold to the UCs.  SOLIS told the UCs that he prefers driving SUBJECT VEHICLE 1 -- which is registered to SOLIS's girlfriend, C.C., at SUBJECT PREMISES 1 -- when transporting firearms.

b.   **SUBJECT VEHICLE 2**:  Once on October 5, 2022, and once on October 17, 2022, SOLIS transported firearms in SUBJECT VEHICLE 2.  SOLIS then sold these firearms to the UCs.  SUBJECT VEHICLE 2 is registered to MONTES at SUBJECT PREMISES 2 and was seen parked outside SUBJECT PREMISES 2 as recently as February 13, 2023.

---

[4] According to surveillance and queries of commercial and government databases conducted as recently as February 14, 2023, two individuals, E.G. and E.R.G., appear to reside at SUBJECT PREMISES 3.  On the morning of January 31, 2023, E.G. was observed exiting the residence and parking a red Chevrolet pickup truck bearing CA license plate 87997J3 in the driveway of SUBJECT PREMISES 3.  This vehicle is registered to E.R.G. at SUBJECT PREMISES 3 and was also observed there on January 5, 2023.  E.R.G.'s criminal history records indicate he has felony arrests for robbery and receiving stolen property, and a felony conviction for willful discharge of a firearm.  Both individuals' addresses of record according to the California DMV is SUBJECT PREMISES 3.

## IV.   <u>STATEMENT OF PROBABLE CAUSE</u>

14.   Based on my review of law enforcement reports, my conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.   **A confidential source tells ATF agents about an Instagram account offering firearms for sale**

15.   In or around mid-July 2022, an ATF confidential source ("CS")[5] notified me that a publicly viewable Instagram account, "@ssaucy.frenchiez" (the "SUBJECT ACCOUNT"), was posting Instagram Stories depicting what appear to be firearms for sale.[6] According to the CS, the CS learned of the account after seeing someone on Instagram repost a "story" from the SUBJECT ACCOUNT depicting firearms.

16.   I instructed the CS to contact SOLIS via the SUBJECT ACCOUNT to see if he was willing to sell firearms.  On or about July 27, 2022, the CS messaged SOLIS using Instagram's direct messaging service by replying to a "story" SOLIS posted depicting a handgun.  The CS asked, "This one clean…"  SOLIS

---

[5] The CS has a 2017 arrest for California Penal Code section 459 (burglary), a 2020 arrest for California Penal Code section 245(a)(1) (assault with a deadly weapon), and an April 2022 arrest for carrying a concealed weapon in a vehicle.  After the April 2022 arrest, the CS agreed to cooperate with ATF in exchange for the possibility of prosecutorial leniency related to this arrest.  Most recently, the CS was arrested in January 2023 for a marijuana offense, specifically, California Health and Safety Code 11360(a).  The CS has no felony convictions.  To the best of my knowledge, I believe that the information provided by the CS in this investigation has been truthful and reliable.

[6] Instagram Stories is a feature within the Instagram social media app whereby a user can post images, videos, texts, or posts from other accounts to the user's "story" video content in a slideshow format.  Content uploaded to a user's "story" expires after 24 hours.

replied, "2500." I understood this to mean that SOLIS was offering to sell the handgun to the CS for $2,500. The CS asked what other firearms SOLIS had. SOLIS replied with two photos of what appear to be AK- and AR-style firearms, followed by a message stating, "Either of those." Communications between the CS and SOLIS terminated at this time.

17. As set forth in greater detail below, I believe SOLIS is the user of the SUBJECT ACCOUNT. On August 22, 2022, after UC-2 provided his/her phone number to the user of the SUBJECT ACCOUNT, UC-2 received a phone call minutes later from the SUBJECT DEVICE, which is registered to "Moises Solis Landeros." On the recorded call, SOLIS introduced himself to a UC as "Mo" from the SUBJECT ACCOUNT. In addition, throughout the investigation, UC-2 has observed that photographs of firearms SOLIS either sold or offered to sell to the UCs have also been posted to the SUBJECT ACCOUNT. Throughout this investigation, SOLIS has sold firearms to UCs that appear to be the same firearms depicting in Instagram stories on the SUBJECT ACCOUNT. On September 12, 2022, after SOLIS sold a pistol and muzzle device to the UCs, the user of the SUBJECT ACCOUNT posted a story depicting what appeared to be the same pistol and muzzle device with the caption, "Going 2. Miss this 1." On or about November 11 and 12, 2022, UC-2 observed multiple posts on the SUBJECT ACCOUNT depicting Colt 1911-style pistols with a blue grips and red tags attached to the pistols by white string. During a controlled purchase from SOLIS on or about November 15, 2022, SOLIS sold a UC agent two Colt 1911-style pistols with

blue grips and red tags attached to them by white strings. These pistols appear identical to the ones posted to the SUBJECT ACCOUNT on or about November 11, 2022. More recently, SOLIS sent the UC several photos from the SUBJECT DEVICE's number depicting AR-style firearms, and similar photos were posted to the SUBJECT ACCOUNT the next day.

### B. An undercover ATF agent unsuccessfully attempts to purchase firearms from SOLIS

18. Based on my review of law enforcement reports, my conversations with other law enforcement agents, and my own knowledge of the investigation, on or about July 29, 2022, an ATF agent acting in an undercover capacity (hereinafter "UC-1") contacted SOLIS on the SUBJECT ACCOUNT posing as a prospective firearms buyer. UC-1 contacted SOLIS independently of the CS and did not mention nor claim any affiliation with the CS. From on or about July 29, 2022 through August 1, 2022, UC-1 and SOLIS exchanged messages via the SUBJECT ACCOUNT, wherein UC-1 inquired about firearms for sale and SOLIS replied with a list of various firearms and their prices, including "P80" firearms bearing no serial number (commonly known as "ghost guns"). The prices ranged from $900 for a P80 handgun to $2,500 for an AR-style firearm.

19. UC-1 and SOLIS tentatively agreed to meet in or around early August to conduct a firearms transaction, but SOLIS questioned the credibility of UC-1's Instagram account, noting that UC-1 had few Instagram "followers," and asked if UC-1 was a

"cop."  SOLIS stopped responding to UC-1 on or about August 1,
2022.

   **C.   SOLIS offers to sell firearms to another undercover
        ATF agent**

   20.  Based on my review of law enforcement reports, my
conversations with other law enforcement agents, and my own
knowledge of the investigation, on or about August 19, 2022,
another ATF undercover agent (hereinafter "UC-2") contacted
SOLIS via the SUBJECT ACCOUNT.  UC-2 replied to a posted "story"
on the SUBJECT ACCOUNT depicting a gold-colored pistol, asking
about the price.[7]  On or about August 20, 2022, SOLIS responded
that it was not for sale, but nonetheless stated "1600," which I
understood to mean that SOLIS would sell the pistol for $1,600.
SOLIS stated that he can get "custom" firearms like the one
depicted in the Instagram story from an associate and sent UC-2
a photo depicting a black and chrome-colored pistol.  UC-2 asked
if each firearm would cost $1,600.  SOLIS stated the price
depended on the type of firearm and that he had quoted $1,600
for his "personal gold ruger .380."

   21.  UC-2 stated that he/she was looking to purchase
firearms and was interested in purchasing the gold Ruger pistol.
SOLIS asked how much money UC-2 was willing to spend.  After UC-
2 affirmed he/she had "enough" money, SOLIS sent UC-2 numerous
photos depicting various handguns and AR-style rifles, asking
UC-2 to "pick your poison."  UC-2 asked SOLIS about the prices

_____

   [7] Like UC-1, UC-2 posed as a prospective purchaser of
firearms and contacted SOLIS independently of the CS and UC-1,
mentioning neither to SOLIS.

of two of the AR-style firearms and a Glock pistol in the photos, as well as his gold-colored Ruger.  SOLIS replied, "1500 each so 6000 all 4."  SOLIS also offered to sell a revolver for $1500.  UC-2 asked if SOLIS would be willing to bring the firearms to the "IE" (referring to the "Inland Empire"), but SOLIS replied, "No delivery sorry pick up only," and that he was located in Compton, California.  SOLIS told UC-2 to let him know which firearms UC-2 wanted so SOLIS could have his associate bring them.  SOLIS stated the firearms are from different "sellers" and that he earns a "commission for the sale."  UC-2 agreed to purchase two AR-style rifles and would get back to SOLIS about possibly purchasing the revolver.  UC-2 stated he/she goes by "Joey," and SOLIS responded by introducing himself as "Mo."

22.  On August 21, 2022, UC-2 messaged SOLIS via the SUBJECT ACCOUNT, stating that one of UC-2's associates would purchase the revolver.  SOLIS replied, "Sounds good fam."

23.  At approximately 11:48 AM on August 22, 2022, UC-2 messaged SOLIS via the SUBJECT ACCOUNT, provided his/her phone number to SOLIS, and requested that SOLIS text message UC-2. Minutes later, at approximately 11:54 AM, UC-2 received a phone call from SOLIS via the SUBJECT DEVICE's phone number: (562) 200-6678.[8]  On the call, which was recorded, SOLIS confirmed that he was "Mo" from the SUBJECT ACCOUNT.  SOLIS stated he believed he had two "short ARs" available but would need to "double

_____

[8] T-Mobile records indicate the number belongs to the SUBJECT DEVICE and is subscribed to "Moises Solis Landeros" at 2048 E 130th Street, Compton, CA 90222.

check." SOLIS confirmed that each firearm would be $1,500 and that the price was not negotiable because SOLIS pays $1,400 per firearm, thus profiting only $100 per firearm. UC-2 and SOLIS tentatively agreed to meet in the afternoon of Wednesday, August 24, 2022.

24. Following this introductory phone call, communications between SOLIS and UC-2 ceased on Instagram and continued primarily via text message and phone call between UC-2's phone and the SUBJECT DEVICE's number. These phone call and text communications were preserved and recorded, as were the aforementioned Instagram communications. During subsequent text message exchanges, in which UC-2 and SOLIS discussed firearms and prices, SOLIS agreed to sell two AR-style firearms and a pistol to UC-2 on August 24, 2022.

25. At approximately 11:49 AM on August 23, 2022, SOLIS confirmed in a call with UC-2 that SOLIS had the three firearms ready to sell the following day. SOLIS asked UC-2 to meet him at his "boy's pad" to conduct the firearms transaction, which was located "right around the corner from me" in Compton. SOLIS confirmed that he would have the firearms ready the following day and texted the following address to UC-2: "2535 e 129th st, Compton ca 90222," which is next door to SUBJECT PREMISES 1.

D. **Controlled Transaction #1: SOLIS sells three firearms to UCs on August 24, 2022**

26. Based on my review of law enforcement reports, my conversations with other law enforcement agents, and my own knowledge of the investigation, on the morning of August 24,

2022, SOLIS called UC-2 using the SUBJECT DEVICE's number to ask
whether they were "still on" for the meeting later that day.
UC-2 confirmed the meeting, stating he/she would be available
starting around noon.

27.   At approximately 12:42 PM, SOLIS called UC-2 again
asking if everything was okay.  UC-2 stated he/she was briefly
delayed and would be ready in approximately a half hour.  At
approximately 1:43 PM, UC-2 texted SOLIS stating he/she was
approximately 20 minutes away.

28.   At approximately 2:02 PM, UC-2 and another undercover
ATF agent ("UC-3") arrived at 2535 E 129th Street in an
undercover car.  UC-2 and UC-3 parked on E 129th street,
slightly east of the above address, and UC-2 called SOLIS to
inform him that UC-2 had arrived.  While UC-2 spoke with SOLIS,
UC-2 observed SOLIS outside of 2535 E 129th Street.

29.   SOLIS walked to the open driver-side window of UC-2's
car and introduced himself as "Mo."  SOLIS advised UC-2 that he
would need to retrieve the firearms from his friend's home.
SOLIS then departed and was observed walking back towards 2535 E
129th Street.  Minutes later, SOLIS returned to UC-2's car from
the direction of 2535 E 129th Street carrying a white paper
tote, entered the driver-side rear door, and got inside.  SOLIS
retrieved two AR-style rifles from a black garbage bag inside
the white paper tote and handed the bag and firearms to UC-3.
SOLIS also handed a gold and black colored pistol to UC-2.

30.   SOLIS advised that he would have more firearms for
sale in the future but that he typically did not sell "ghost

14

guns." Towards the end of the meeting, UC-2 and UC-3 paid SOLIS a total of $5,500 for the firearms. SOLIS then exited UC-2's car and walked back towards 2535 E 129th Street.

31. UC-2 and UC-3 then departed the area and drove to a pre-determined staging location. Upon examination by ATF agents, the firearms purchased were determined to be the following:

     a. An AR-style, 5.56x45mm caliber, semi-automatic rifle, with unknown manufacturer, with a barrel less than 16 inches in length, namely, approximately 10.375 inches in length, bearing no serial number;

     b. An AR-style, .300 BLK caliber, semi-automatic rifle, with unknown manufacturer, with a barrel less than 16 inches in length, namely, approximately 7 inches in length, bearing no serial number; and

     c. A Ruger, model LCP II, .380 caliber pistol, bearing serial number 380627048.

**E. Controlled Transaction #2: SOLIS sells two firearms and ammunition to UCs on September 12, 2022**

32. Based on my review of law enforcement reports, my conversations with other law enforcement agents, and my own knowledge of the investigation, SOLIS and UC-2 continued to communicate via the SUBJECT DEVICE's number regarding additional firearms SOLIS was offering for sale and their prices. SOLIS sent UC-2 photos via text message depicting these firearms.

33. On or about September 9, 2022, UC-2 messaged SOLIS stating he/she would be back in the Los Angeles area on Monday,

September 12, 2022.  SOLIS agreed to sell UC-2 a "short" rifle, a pistol with a "quiet," which I understand to be a term used to refer to a silencer, and a revolver.  UC-2 asked SOLIS to let him/her know if SOLIS gets anymore "shorts."  SOLIS replied, "My builder said 1 week."  UC-2 also asked SOLIS if the "quiet" pistol was "fully," or fully-automatic.  SOLIS replied, "I believe so," and, "Lmk if it's for sure Cus I got couple people that want it."

34.  On or about September 11, 2022, SOLIS confirmed via text message that he would have the three firearms ready for sale the following day, and that the prices were $2,500 for the pistol and silencer, $2,000 for the short-barreled rifle, and $1,500 for the revolver.  SOLIS also confirmed that the transaction would take place outside 2535 E 129th Street.

35.  At approximately 1:26 PM on September 12, 2022, UC-2 messaged SOLIS stating he/she would be at 2535 E 129th Street in approximately half an hour.  SOLIS replied, "Ok."  At approximately 1:45 PM, UC-2 messaged SOLIS to confirm that SOLIS had all three firearms.  SOLIS stated he did not have the revolver and that his source for the revolver had not answered him "all day."  UC-2 agreed to purchase the two remaining firearms.

36.  While UC-2 and another ATF undercover agent ("UC-4") were en route to 2535 E 129th Street, ATF surveillance units observed SOLIS arrive at 2535 E 129th Street driving a blue Cadillac sedan bearing California license plate number 6ULP941

(hereinafter the "Cadillac").[9]  At approximately 2:15 PM, UC-2 and UC-4 arrived on E 129th Street, and UC-2 called SOLIS to inform him that UC-2 had arrived.

37.  Shortly after the phone call, UC-2 and UC-4 observed SOLIS walking from the direction of 2535 E 129th Street towards UC-2's car, carrying what appeared to be drawstring camping bags and a gym bag.  When SOLIS arrived at UC-2's car, he got in the passenger-side rear door.  SOLIS then handed a short-barreled rifle and a pistol to the UCs.

38.  SOLIS advised that he did not have a magazine for the short-barreled rifle and would discount the price to $1,900. SOLIS commented that the rifle was "little" and "super short." SOLIS confirmed that his "buddy" had shot the pistol with the suspected silencer and claimed, "it's for sure quiet, bro." Regarding the pistol, SOLIS stated, "I believe its fully. . . . That's what they were telling me . . . those you can't get 'em here in the States."  SOLIS stated that he currently resides at 2535 E 129th Street, which belongs to his grandmother.  During the meeting, SOLIS emptied live rounds of ammunition from a magazine belonging to the pistol into the cupholder of the UCs' car.  The UCs paid SOLIS $4,400 for the firearms.

39.  At approximately 2:24 PM, the transaction ended, and the UCs departed the area.  Upon later examination by ATF agents, the firearms and accessories purchased from SOLIS were determined to be the following:

---

[9] According to California DMV records, this vehicle was registered to Solis Landeros Moises, Rafael, 2048 E 130th Street, Compton, CA 90222 at the time of this meeting.

      a.   A Masterpiece Arms, 9mm caliber, pistol, bearing the serial number F2137, with an attached cylindrical muzzle device.[10]

      b.   An unknown caliber rifle, with unknown manufacturer, with a barrel less than 16 inches in length, namely, approximately 8.25 inches in length, bearing no serial number; and

      c.   Nine rounds of 9mm ammunition originally loaded in the magazine belonging to the pistol.

40.  Later that evening while monitoring the SUBJECT ACCOUNT, UC-2 observed a story depicting what appeared to be the pistol and silencer SOLIS had sold to UC-2 earlier that day, with the caption, "Going 2. Miss this 1."

**F.   Controlled Transaction #3: SOLIS sells a pistol and ammunition to UCs on October 5, 2022**

41.  Based on my review of law enforcement reports, my conversations with other law enforcement agents, and my own knowledge of the investigation, following the September 12th transaction, SOLIS and UC-2 continued to communicate via the SUBJECT DEVICE's number regarding additional firearms sales. On September 13, 2022, UC-2 informed SOLIS that he/she was out of town and requested that SOLIS inform UC-2 about any new "shorts," referring to short-barreled rifles, for sale. SOLIS agreed.

---

[10] Based on my training and experience and the physical characteristics of the muzzle device, I made the preliminary determination that the muzzle device was not a firearm silencer.

42.  On September 14, 2022, SOLIS informed UC-2 that he had a pistol and silencer for sale for $3,000.

43.  On or about September 22, 2022, UC-2 messaged SOLIS advising him that UC-2 would be back in the Los Angeles area soon and asked if SOLIS had any more firearms for sale.  SOLIS stated, "That beretta with quiet thang," followed by, "And FN 57,"  which based on my training and experience I interpreted to mean a Beretta pistol with a silencer and an FN Herstal 5.7x28mm pistol.

44.  In or around late September 2022, SOLIS and UC-2 negotiated the prices of the Beretta pistol with a silencer and the FN Herstal 5.7x28mm pistol via the SUBJECT DEVICE.  On or about October 1, SOLIS agreed to sell the two firearms to UC-2 for $6,000 on October 5, 2022.  At approximately 11:17 AM on October 5, 2022, UC-2 messaged SOLIS to ask if he had ammunition for the firearms, and SOLIS replied that he had 50 rounds of 5.7x28mm ammunition for $150.  UC-2 and UC-4 arrived at 2535 E 129th Street at approximately 12:00 PM.  At approximately 12:05 PM, UC-2 called SOLIS at the SUBJECT DEVICE's number, and SOLIS stated he was "around the corner."  SOLIS arrived a couple of minutes later and parked in the driveway of SUBJECT PREMISES 1, one house east of 2535 E 129TH STREET.  SOLIS exited his vehicle and walked towards the backyard of SUBJECT PREMISES 1, opened a gate, and walked out of view.  After several minutes, SOLIS returned to the front of SUBJECT PREMISES 1 carrying a black case.  SOLIS got into the UCs' car with the black case, which contained a pistol and a box of ammunition.

45.   During the meeting, SOLIS advised that he did not have the Beretta handgun with the silencer ready for sale as previously agreed.   SOLIS reported that the person who had the aforementioned firearm was at "the dealership" and that SOLIS would not have the firearm until later in the afternoon.   SOLIS offered to meet UC-2 and UC-4 later in the day to complete the sale of the Beretta and silencer.   SOLIS also stated that the individual who manufactures the short-barreled rifles would not be willing to meet the UCs in person.   UC-2 paid SOLIS $3,100 for the firearm and ammunition.

46.   At approximately 12:17 PM, the transaction ended, and SOLIS exited the UCs' car and walked back towards SUBJECT PREMISES 1.

47.   ATF agents later examined the firearm and ammunition, and determined them to be the following:

        a.   An FN Herstal 5.7x28mm pistol bearing serial number 386351866; and

        b.   Approximately 50 rounds of 5.7x28mm ammunition.

**G.   Controlled Transaction #4: SOLIS sells a pistol, silencer, and ammunition to UCs on October 5, 2022**

48.   Based on my review of law enforcement reports, my conversations with other law enforcement agents, and my own knowledge of the investigation, I know that surveillance units followed SOLIS after the first transaction on October 5, 2022. SOLIS left SUBJECT PREMISES 1 in the Cadillac.   SOLIS stopped in front of SUBJECT PREMISES 2 from approximately 12:42 PM until

approximately 1:10 PM but was not observed exiting the Cadillac during that time.

49.  At approximately 1:10 PM, UC-2 texted SOLIS stating that he/she was not available to purchase the Beretta pistol and silencer from SOLIS that day.  SOLIS replied, "Ok no worries Lmk I was about to call u."

50.  At approximately 1:13 PM, SOLIS pulled into the driveway of SUBJECT PREMISES 3.  SOLIS exited the Cadillac and walked into the carport belonging to the residence, out of sight.  At approximately 1:15 PM, SOLIS emerged from SUBJECT PREMISES 3, got into the Cadillac, and drove back to E 129th Street.  SOLIS and an unknown person then exited the Cadillac. Investigators were not aware that there was a passenger in the Cadillac until this time.

51.  SOLIS and the unknown person got into a black Ford Mustang bearing CA license plate #2BKY951 and drove to Alameda Tires and Auto Repair, located at 1501 N Alameda Street.[11] Surveillance units last observed the Mustang parked inside the service bay on the west side of the business.

52.  At approximately 1:38 PM, SOLIS called UC-2 using the SUBJECT DEVICE's number and stated that he was "ready" with the "quiet one," and that he had "just picked it up."  UC-2 said he/she would call back SOLIS.  Minutes later, at approximately 1:46 PM, UC-2 texted SOLIS stating he/she was on his/her way to

---

[11] According to California Department of Motor Vehicles ("DMV") records, the registered owner of the Mustang is J.B.G. at an address on W 5th Street, Los Angeles, CA 90048.

meet SOLIS again but that the meeting had to be brief.  SOLIS agreed.

53.  At approximately 2:08 PM, UC-2 and UC-4 arrived back at 2535 E 129th Street.  UC-2 called SOLIS on the SUBJECT DEVICE's number, and SOLIS stated he was "five minutes away, I'm right here going down Alameda."  At approximately 2:17 PM, SOLIS arrived in SUBJECT VEHICLE 2 and exited the passenger side. SUBJECT VEHICLE 2 continued westbound on E 129th street. According to California DMV records, SUBJECT VEHICLE 2 is registered MONTES at SUBJECT PREMISES 2.

54.  SOLIS approached the front passenger side window of the UCs' car carrying a brown cardboard box and passed the box to the UCs through the front-passenger window.  The box contained two black plastic containers, which in turn contained a pistol with two magazines, a silencer, and approximately 75 rounds of ammunition.  SOLIS commented, "my bad about earlier." After UC-2 and UC-4 examined the contents of the boxes, UC-4 paid $3,000 to SOLIS for the pistol, silencer, and ammunition.

55.  ATF agents later examined the firearm, silencer and ammunition and determined them to be the following:

a.   A Pietro Beretta, model M9A3, 9mm caliber pistol, bearing serial number B011012Z;

b.   A black silencer;[12] and

---

[12] This item was submitted to and tested by ATF's Firearms Technology Criminal Branch and determined to be firearm silencer as defined under 18 U.S.C. § 921(a)(25) and therefore also a "firearm" as defined in 26 U.S.C. § 5845(a)(7), the National Firearms Act ("NFA").  The silencer bears no manufacturer marks of identification or serial number as required by 26 U.S.C. § 5842.

c.   Approximately 75 rounds of 9mm ammunition, six rounds of which were loaded in the magazine belonging to the Beretta pistol.

**H.   Controlled Transaction #5: SOLIS sells two short-barreled rifles, a revolver, and ammunition to UCs on October 17, 2022**

56.   Based on my review of law enforcement reports, my conversations with other law enforcement agents, and my own knowledge of the investigation, I know that SOLIS and UC-2 continued to communicate via the SUBJECT DEVICE's number regarding additional firearms sales.  In or around mid-October 2022, SOLIS agreed to sell two AR-style rifles and a revolver to UC-2 on Monday, October 17, 2022.

57.   On the morning of October 17, UC-2 informed SOLIS that he/she would meet with him around noon or shortly thereafter. SOLIS confirmed to UC-2 the firearms were ready.  At approximately 1:54 PM, UC-2 texted SOLIS to say he/she was almost at the meeting location and asked if SOLIS was there already.  SOLIS replied, "Yessir."  At approximately 1:57 PM, surveillance units observed a white Chevrolet pickup truck resembling SUBJECT VEHICLE 2 pulling away from SUBJECT PREMISES 2.

58.   At approximately 2:03 PM, UC-2 and UC-4 arrived and parked on the north side of E 129th Street, in front 2535 E 129th Street.  UC-2 observed SUBJECT VEHICLE 2 arrive and park at SUBJECT PREMISES 1.  SOLIS was then observed walking from SUBJECT VEHICLE 2 to the Cadillac.  UC-2 greeted SOLIS, who was carrying a black plastic bag and a yellow towel, and asked SOLIS

to get into the passenger-side front seat of the UC's car.  Once inside the UC's car, SOLIS produced a revolver, two AR-style firearms, and ammunition.  SOLIS stated the individual who builds the rifles "feels safe" building two at a time.  UC-2 asked if the rifles could come fully automatic.  SOLIS referred to "sears" for making a rifle fully automatic.[13]  SOLIS stated his builder can add them, but they would cost an additional $500.  UC-2 and UC-4 then paid SOLIS $5,500 for the rifles and revolver.

59.  During the meeting, SOLIS stated that he had two more FN firearms that he could go pick up "right now," and that the firearms were "ten minutes away."  UC-2 stated he would call SOLIS about the additional firearms.  SOLIS also stated that he likes to drive his girlfriend's Mercedes Benz C300 sedan ("SUBJECT VEHICLE 1"), which SOLIS purchased for her.  SOLIS stated, "I like to drive in that one, ridin' dirty," and that he feels "safer" in SUBJECT VEHICLE 1 than in the Cadillac.  According to California DMV records, SUBJECT VEHICLE 1, which bears California license plate number 9ABX232, is registered to C.C. at SUBJECT PREMISES 1.

60.  At approximately 2:13 PM, the meeting concluded.  SOLIS exited the UCs' car, and the UCs departed westbound on E 129th street.  Surveillance units observed SOLIS get into the

---

[13] Based on my training and experience, I understand "sears" to refer to machinegun conversion devices, or pieces designed and intended for converting certain AR-style rifles from semi-automatic to fully automatic once installed.

driver's seat of SUBJECT VEHICLE 2 and noted there was at least one other unknown subject inside SUBJECT VEHICLE 2.

61.  Upon later examination, ATF agents determined that the purchased firearms and ammunition were as follows:

      a.  A privately manufactured, 5.56x45mm caliber rifle, with a barrel less than 16 inches in length, namely, approximately 8.875 inches in length, bearing no serial number;

      b.  A privately manufactured, 5.56x45mm caliber rifle, with a barrel less than 16 inches in length, namely, approximately 8.875 inches in length, bearing no serial number;

      c.  A Smith and Wesson, model 10-5, .38 caliber revolver, bearing serial number 05727; and

      d.  Approximately 50 rounds of .38 caliber ammunition.

### I.  Controlled Transaction #6: SOLIS sells two more pistols to undercover ATF agents on October 17, 2022

62.  At approximately 2:29 PM on October 17, 2022, in response to a text message from UC-2, SOLIS stated that he would sell the FN firearms to UC-2 for $3,000 each and that the firearms were located "5 min away."  UC-2 agreed to purchase the FN pistols, and SOLIS replied, "Ok I'm pick them up have them ready for u."

63.  SOLIS made various stops around the Compton area in SUBJECT VEHICLE 2 while being followed by surveillance.  SOLIS appeared to pick up and drop off children after school and made stops at a McDonald's restaurant and SUBJECT PREMISES 2.  At approximately 3:11 PM, UC-2 messaged SOLIS asking if he was

ready.  SOLIS replied at 3:12 PM, with "Yea I'm ready g," and,
"What's your eta."  At approximately this same time,
surveillance units observed SOLIS standing by the driver's side
of SUBJECT VEHICLE 2 outside SUBJECT PREMISES 2.

64.  At approximately 3:18 PM, UC-2 texted SOLIS that
he/she was approximately 15 minutes away.  SOLIS then left
SUBJECT PREMISES 2, arriving back at E 129th street.  At
approximately 3:36 PM, UC-2 messaged SOLIS stating that UC-2 and
UC-4 would be at SUBJECT PREMISES 1 in a few minutes.  SOLIS
replied, "Ok."  At approximately 3:46 PM, UC-2 and UC-4 arrived
at SUBJECT PREMISES 1.  At approximately the same time,
surveillance units observed SUBJECT VEHICLE 2 depart E 129th
street.  UC-2 called SOLIS via the SUBJECT DEVICE's number, and
SOLIS stated he was "two minutes away."

65.  At approximately 3:49 PM, surveillance units observed
SOLIS arrive at SUBJECT PREMISES 3, exit the passenger side of
SUBJECT VEHICLE 2, and walk towards SUBJECT PREMISES 3.  SOLIS
appeared to be using a cellphone.  At this time, a black Honda
sedan arrived and pulled into the driveway of SUBJECT PREMISES
3, followed by SOLIS on foot, who disappeared from sight.  At
approximately 3:52 PM, UC-2 messaged SOLIS asking where he was.
SOLIS replied that he was at a traffic light on El Segundo.  UC-
2 stated he/she felt uncomfortable waiting.  SOLIS replied, "Lol
ur good pop that's my block I'm almost there."

66.  At approximately 3:57 PM, surveillance observed SOLIS
emerge from SUBJECT PREMISES 3 holding a Bath and Body Works bag
and get into SUBJECT VEHICLE 2, which then departed.  At

approximately 3:59 PM, SOLIS arrived back in the vicinity of SUBJECT PREMISES 1, got out of SUBJECT VEHICLE 2 carrying the Bath and Body Works bag, and got into the UCs' vehicle.  SOLIS took two FN pistols and magazines from the Bath and Body Works bag and handed them to the UCs.  SOLIS stated that the same person who builds the ghost gun rifles obtained the FN pistols from Texas.  UC-2 paid $6,100 to SOLIS for the pistols.

67.  Upon later examination by ATF agents, the purchased firearms were determined to be the following:

a.  A FN Herstal, model Five-seven, 5.7x28mm caliber pistol, bearing serial number 386408015; and

b.  A FN Herstal, model Five-seven, 5.7x28mm caliber pistol, bearing serial number 386227206.

**J.    Controlled Transaction #7: SOLIS sells four firearms to a UC on November 15, 2022**

68.  Based on my review of law enforcement reports, my conversations with other law enforcement agents, and my own knowledge of the investigation, I know that SOLIS and UC-2 continued to communicate via the SUBJECT DEVICE's number regarding further firearms sales.  From on or about October 26 to mid-November 2022, UC-2 and SOLIS exchanged text messages discussing firearms SOLIS was offering for sale.  During this time, SOLIS sent UC-2 numerous photos depicting firearms.  SOLIS also agreed to sell three AR-style rifles to UC-2 for $6,500.  As UC-2 was unavailable at the time of the planned transaction, SOLIS agreed to have UC-2 put SOLIS in communication with UC-4.

69.  On November 14, 2022, UC-4 texted SOLIS on the SUBJECT DEVICE's number and introduced himself/herself.  SOLIS offered to sell two AR-style firearms, a "P50" firearm, and an FN pistol to UC-4 for $11,500 the following day.  SOLIS stated that a third AR-style firearm had already been sold.

70.  At approximately 12:16 PM on November 15, 2022, UC-4 texted SOLIS stating he/she would arrive at the meeting location at approximately 2 PM.  UC-4 arrived at SUBJECT PREMISES 1 at approximately 2:05 PM and messaged SOLIS that he/she was "outside."  SOLIS instructed UC-4 to park behind a Mercedes Benz station wagon that was parked in the driveway of SUBJECT PREMISES 1.  At approximately 2:07 PM, SOLIS emerged from the rear of SUBJECT PREMISES 1, walked down the driveway, and entered UC-4's car.

71.  During the meeting, SOLIS told UC-4 that he did not have the P50 firearm because the person who had it went to San Francisco.  SOLIS gave UC-4 two AR-style firearms and an FN pistol.  SOLIS also showed UC-4 a Colt pistol and asked if UC-4 wanted to purchase it instead of the P50 firearm.  SOLIS stated the price would be the same.  UC-4 agreed and gave SOLIS $11,500 for the four firearms.  SOLIS stated he had another Colt firearm and that he can "go pick it up right now."  UC-4 stated he/she would call an associate and let SOLIS know about purchasing the second Colt firearm.  The meeting concluded at approximately 2:13 PM.  SOLIS exited UC-4's car, proceeded to the rear of SUBJECT PREMISES 1, and entered a secondary structure at the back of the property.

72.   Upon later examination by ATF agents, the firearms purchased were determined to be the following:

a.   A privately manufactured AR-style, .223 caliber pistol, bearing no serial number;

b.   An AR-style, Palmetto State Armory, model PA-15, multi-caliber pistol, bearing serial number SCD476337;

c.   A Colt, model Government, .38 Super caliber pistol, bearing serial number 38SCC4679; and

d.   An FN Herstal, model Five-seven, 5.7x28mm caliber pistol, bearing serial number 386285747.

**K.   Controlled Transaction #8: SOLIS sells another Colt pistol to a UC on November 15, 2022**

73.   Following the sale of four firearms to UC-4, SOLIS messaged UC-4 at approximately 2:17 PM, stating that he had an AK-style firearm for sale for "4500," followed by, "And 4000 for colt 38 super."  UC-4 stated he/she would purchase the Colt .38 caliber firearm.  SOLIS replied at approximately 2:23 PM, "Ok I just picked it up."

74.   At approximately 2:25 PM, SOLIS emerged from the rear of SUBJECT PREMISES 1, entered a Cadillac, and drove to a shopping plaza located at the southwest corner of Alondra Blvd. and Long Beach Blvd. in Compton.  SOLIS parked the Cadillac in front of a chain restaurant at 961 S Long Beach Blvd. and entered the restaurant.  At approximately 2:43 PM, SUBJECT VEHICLE 2, driven by MONTES, arrived and parked east of Amore Beauty Lounge.  At approximately 2:45 PM, SOLIS approached SUBJECT VEHICLE 2, wearing a black cross-body bag across his

chest.  SOLIS opened the passenger door, reached into the front passenger seat of SUBJECT VEHICLE 2, and grabbed an unknown item from the vehicle.  SOLIS placed the item into the black colored cross-body bag and closed the front passenger door.  SOLIS and MONTES appeared to be in conversation through the open front passenger window of SUBJECT VEHICLE 2.

75.  At approximately 2:49 PM, SOLIS walked back towards the Cadillac carrying the cross-body bag, entered the Cadillac, and left the shopping plaza.  MONTES departed the shopping plaza as well.

76.  I later analyzed toll records for the SUBJECT DEVICE during the approximate time frame when SOLIS went to the shopping plaza.  From this analysis, I learned that the SUBJECT DEVICE made or received four phone calls with (562) 388-8433[14] from approximately 2:26 PM through 2:55 PM, when SOLIS traveled to and was at the shopping plaza.

77.  At approximately 2:57 PM, UC-4 messaged SOLIS stating he/she had only $3,500 for the Colt firearm, and SOLIS agreed to sell the Colt firearm to UC-4 for that price.  UC-4 stated he/she would arrive at SUBJECT PREMISES 1 in approximately 20 minutes.

78.  At approximately 3:18 PM, surveillance units at SUBJECT PREMISES 2 observed MONTES arrive in SUBJECT VEHICLE 2 and enter SUBJECT PREMISES 2 via the door on Oleander Avenue.

---

[14] As of January 6, 2023, this number is subscribed to N.S. at SUBJECT PREMISES 2.

79.  At approximately 3:20 PM, surveillance units observed the Cadillac driven by SOLIS arrive at SUBJECT PREMISES 3. After a black Dodge Ram pickup truck arrived, the Cadillac followed the pickup truck down the driveway of SUBJECT PREMISES 3 out of sight.  At approximately 3:23 PM, an unknown male manually opened the gate, and the Cadillac departed SUBJECT PREMISES 3.

80.  At approximately 3:26 PM, surveillance units observed SOLIS arrive at SUBJECT PREMISES 1 in the Cadillac.  Moments later, UC-4 arrived and parked in front of SUBJECT PREMISES 1. SOLIS then approached UC-4 carrying a blue box and got into UC-4's car.  SOLIS sold UC-4 a Colt pistol, which he described as "new," for $3,500.  At approximately 3:28 PM, the meeting concluded, SOLIS exited UC-4's car, and walked back towards SUBJECT PREMISES 2.

81.  Upon later examination by ATF agents, the firearm purchased was determined to be a Colt, model Government, .38 Super caliber pistol, bearing serial number 38SCC4852.

**L.    Controlled Transaction #9: SOLIS sells an AK-style pistol and ammunition to UCs on January 5, 2023**

82.  Based on my review of law enforcement reports, my conversations with other law enforcement agents, and my own knowledge of the investigation, I know that SOLIS and UC-2 continued to communicate via the SUBJECT DEVICE's number regarding future firearms sales.  On January 4, 2023, SOLIS agreed to sell two AR-style rifles without magazines and an AK-

style firearm to UC-2 for $6,400 the following day.  SOLIS also offered to sell a Sig Sauer pistol.

83.  On the morning of January 5, 2023, SOLIS confirmed the meeting and offered to sell a third AR-style firearm to UC-2 for $2,300.  UC-2 asked if the Sig Sauer pistol was in his possession or if he needed to retrieve it.  SOLIS replied, "I need to pick it up but it's close []by."  At approximately 12:32 PM, UC-2 informed SOLIS that he/she was less than an hour from SUBJECT PREMISES 1.  UC-2 stated that UC-2 would let SOLIS know about the additional AR-style firearm and Sig Sauer pistol when UC-2 arrived.

84.  At approximately 1:08 PM, when UC-2 and UC-4 arrived near SUBJECT PREMISES 1, UC-2 called SOLIS, and SOLIS instructed UC-2 to park in the driveway of SUBJECT PREMISES 1.  While the UCs were parking, SOLIS arrived at SUBJECT PREMISES 1 in SUBJECT VEHICLE 1.

85.  SOLIS spoke to UC-2 from SUBJECT VEHICLE 1, explaining that the AK-style firearm was in the rear of SUBJECT PREMISES 1, and that he had to retrieve the two AR-style firearms from a location nearby.  SOLIS then left in SUBJECT VEHICLE 1.

86.  When SOLIS returned several minutes later, he got out of SUBJECT VEHICLE 1 and walked towards the pedestrian gate leading to the backyard of SUBJECT PREMISES 1.  Shortly thereafter, UC-2 observed SOLIS walking back towards the driveway where the UCs were parked, carrying a white plastic garbage bag in his hands.  At approximately 1:14 PM, SOLIS got into the front passenger seat of the UCs' car.  SOLIS took out

an AK-style pistol from the plastic bag and handed it to the UCs.

87.   SOLIS advised that the two AR-style firearms were not ready but would be shortly.  SOLIS stated the individual manufacturing the two AR-style firearms was also offering the Sig Sauer pistol for sale.  SOLIS stated the third AR-style firearm was ready and that his "cousin" could pick it up nearby. Around this same time, SUBJECT VEHICLE 2 passed by on E 129th Street, driven by MONTES.  SOLIS gestured to the vehicle, advising that the driver, MONTES, was his "cousin."  SOLIS also stated that MONTES had a Kimber handgun for sale for $1,800. SOLIS also told the UCs that he had traded the Cadillac in for a different vehicle.

88.   Upon later examination by ATF agents, the firearm purchased was determined to be a Zastava, model PAP, 7.62x39mm caliber pistol, bearing serial number ZAPAP1102066.

89.   Towards the end of the meeting, in the presence of the UCs, SOLIS placed three phone calls.[15]

        a.   At approximately 1:24 PM, SOLIS called an unknown individual, inquiring about the status of the third AR-style firearm.  At approximately this same time, I noted that the SUBJECT DEVICE's number dialed 310-667-0647.  After the call,

---

[15] On December 8, the Honorable Patricia Donahue, United States Magistrate Judge, signed a court order authorizing installation of a pen register and trap and trace device on the SUBJECT DEVICE's number, which became active on December 16, 2022.  I have examined the real-time pen register data for the calls and text messages to and from the SUBJECT DEVICE's number.

SOLIS told the UCs that this source was different from the source manufacturing the two AR firearms without magazines.

b.   At approximately 1:25 PM, SOLIS called an individual believed to be MONTES.  At approximately the same time, I noted that the SUBJECT DEVICE's number dialed 562-388-8433.[16]  According to the UCs, it appeared that SOLIS was coordinating with MONTES what vehicle to use to retrieve more firearms.  While speaking with MONTES, SOLIS referenced "Park Village."  After this call, UC-2 paid SOLIS $2,000 for the AK-style pistol.  SOLIS then said that MONTES was going to pick him up and that they were going to go "get it," referring to the third AR-style firearm from another unknown source different from the manufacturer.

c.   At approximately 1:28 PM, SOLIS called an individual, believed to be the person manufacturing AR-style firearms for SOLIS, to ascertain when the firearms would be completed.  When the call appeared to connect, SOLIS asked, "What's the update?  What's the update?"  At approximately this same time, I noted that the SUBJECT DEVICE's number dialed 323-901-7887 (hereinafter the "7887" number).[17]

90.  Following this third call, the meeting ended and SOLIS exited the UCs' car.  At that time, SUBJECT VEHICLE 2 approached

---

[16] This is the same number the SUBJECT DEVICE was in contact with at least four times on November 15, 2022, when SOLIS met MONTES at a shopping plaza.

[17] Subscriber information from T-Mobile, Inc. indicates this number belongs to J.S. at 9210 State Street, Lynwood, CA 90262, but I believe the 7887 number to be used by an individual who builds privately manufactured firearms for SOLIS to sell.

and stopped in the vicinity of SUBJECT PREMISES 1.  SOLIS again
confirmed to the UCs that MONTES, the individual in SUBJECT
VEHICLE 2, was his "cousin."  SOLIS spoke with MONTES through
the driver's window of SUBJECT VEHICLE 2 before SOLIS departed
eastbound in SUBJECT VEHICLE 1, followed by MONTES in SUBJECT
VEHICLE 2.  The UCs remained in the driveway of SUBJECT PREMISES
1.

   **M.   Controlled Transaction #10: SOLIS sells two AR-style
         short-barreled rifles and an AR-style pistol to UCs on
         January 5, 2023**

   91.  Surveillance units observed SUBJECT VEHICLE 1 and
SUBJECT VEHICLE 2 turn onto Alameda Street from E 129th Street.
MONTES parked SUBJECT VEHICLE 2 on Alameda Street and got into
SUBJECT VEHICLE 1 with SOLIS.  Surveillance units followed SOLIS
and MONTES to the Jasmine Garden apartments in Compton,
California.[18]  An individual matching SOLIS's description got out
of SUBJECT VEHICLE 1 and walked in the direction of the
apartment complex.

   92.  At approximately 1:42 PM, UC-2 texted SOLIS asking
about his status.  SOLIS replied that was five minutes away, and
that he just picked up the two AR-style firearms.
Based on my review of pen register data, at approximately 1:43
PM, the SUBJECT DEVICE's number made an outgoing call to the
7887 number.  Approximately two minutes later, surveillance
units observed SUBJECT VEHICLE 1 arrive at SUBJECT PREMISES 3,

_____

   [18] According to a publicly available 2015 press release by
the ROEM real estate development corporation, the Park Village
apartments in Compton, California were renovated and renamed the
Jasmine Garden Apartments.

backing into the driveway.  SUBJECT VEHICLE 1 was observed with its trunk open before departing shortly thereafter.  Below is a surveillance photograph of SUBJECT VEHICLE 1 parked in the driveway of SUBJECT PREMISES 3 with its trunk open on January 5, 2023.

93.  At approximately 1:48 PM, SOLIS arrived back on E 129th Street in SUBJECT VEHICLE 1.  SOLIS got out of SUBJECT VEHICLE 1, retrieved a black plastic bag and a black bomber-style jacket from the trunk, and then entered the front passenger seat of the UCs' car.  SOLIS took out two AR-style short-barreled rifles from the plastic bag, and one AR-style pistol from the bomber-style jacket.  UC-2 and UC-4 paid SOLIS $6,700 for the three firearms.

94.  Upon later examination by ATF agents, the firearms purchased were determined to be:

a.  A privately manufactured, 5.56x45mm caliber rifle, having a barrel of less than 16 inches in length, namely, approximately 9 inches, bearing no serial number; and

b.  A privately manufactured, 5.56x45mm caliber rifle, having a barrel of less than 16 inches in length, namely, approximately 9 inches, bearing no serial number; and

c.  An Aero Precision, model M4E1, 5.56x45mm caliber AR-style pistol bearing serial number M4-0349508.

**N.    Controlled Transaction #11: SOLIS sells two pistols to UCs on January 5, 2023**

95.    Based on my review of law enforcement reports, my conversations with other law enforcement agents, and my own knowledge of the investigation, I know that during the first controlled transaction on January 5, 2023, UC-2 asked SOLIS about the Sig Sauer pistol, and SOLIS replied that UC-2 did not tell him to bring it.  SOLIS stated the Kimber pistol was available for sale for $1,800 unless UC-2 wanted to offer MONTES a different price.  SOLIS stated that he would have to go get the Kimber pistol from MONTES from "around the corner," and that SOLIS could also retrieve the Sig Sauer pistol, which was from a different source, from "right around the corner."  SOLIS confirmed that price of the Sig Sauer pistol was $2,500.  SOLIS agreed to go get the Kimber and Sig Sauer pistols for the UCs, while the UCs remained in their car outside SUBJECT PREMISES 1.  As SOLIS got out of the UCs' car, SOLIS remarked that he should have texted UC-2 when he was at his firearm source's house earlier that day to ask if UC-2 wanted the Sig Sauer pistol.

96.    At approximately 1:56 PM, surveillance units observed SUBJECT VEHICLE 1 arrive at SUBJECT PREMISES 2, parking briefly by the driveway gate.  A male passenger, believed to be MONTES, got out of SUBJECT VEHICLE 1 and entered SUBJECT PREMISES 2.  At approximately this time, the SUBJECT DEVICE's number called the 7887 number.  At approximately 2:00 PM, MONTES exited SUBJECT PREMISES 2 and got into SUBJECT VEHICLE 1, which left SUBJECT PREMISES 2.  Approximately a minute later, the SUBJECT DEVICE's

number dialed the 7887 number again, but the call connected for less than one second.[19]

97.   At approximately 2:03 PM, surveillance units observed SUBJECT VEHICLE 1 arrive at SUBJECT PREMISES 3.   SUBJECT VEHICLE 1 drove down the driveway of SUBJECT PREMISES 3 through the open security gate and out of sight.   About a minute later, SUBJECT VEHICLE 1 departed from SUBJECT PREMISES 3.

98.   At approximately 2:05 PM, SUBJECT VEHICLE 1 arrived back at SUBJECT PREMISES 1.   SOLIS exited SUBJECT VEHICLE 1 with his hands in the front pocket of his sweatshirt and got inside the front passenger door of the UCs' car.   Once inside, SOLIS took out two pistols from the front pocket of his sweatshirt and gave them to the UCs.   UC-4 counted out $4,100 and paid SOLIS for the pistols.

99.   While talking with the UCs, SOLIS appeared to receive an alert on a cellphone and then advised the UCs that his source had "another short one" with the "stock on it" for $2,200. SOLIS showed the UCs a photo of the firearm on the cellphone and remarked that his source "actually built three" AR-style firearms for SOLIS that day.   SOLIS offered to hold the firearm for the UCs.   The meeting concluded at approximately 2:12 PM. SOLIS exited the UCs' car and got into SUBJECT VEHICLE 1, and the UCs departed the area.

---

[19] Pen register data indicates that the SUBJECT DEVICE's number did not make or receive any calls or short-message service ("SMS", or text) messages to any other phone numbers besides the 7887 number between when SOLIS left the UCs at 1:52 PM and the two calls to the 7887 number at 1:56 PM and 2:01 PM.

100. Upon later examination by ATF agents, the firearms purchased were determined to be:

a.   A Sig Sauer, model M17, 9mm caliber pistol, bearing serial number: M17-0211; and

b.   A Kimber, model Micro 380, .380 ACP caliber pistol, bearing serial number P0105748.

101. Based my review of the recorded transaction and discussions with other law enforcement agents, I believe that SOLIS and MONTES obtained the Kimber pistol from SUBJECT PREMISES 2 and the Sig Sauer pistol from SUBJECT PREMISES 3 for the following reasons:

a.   SOLIS told the UCs that his cousin MONTES was the source of the Kimber pistol and that the Sig Sauer pistol was from the individual who had just built the two AR-style rifles.

b.   SOLIS told the UCs that he was going to retrieve both pistols to sell them to the UCs.

c.   SOLIS stated that he wished he had asked if UC-2 wanted to buy the Sig Sauer pistol when he was at his firearms source earlier, which I interpreted to mean that SOLIS's firearms source had the Sig Sauer pistol available at SUBJECT PREMISES 3 when SOLIS was with the firearms source at SUBJECT PREMISES 3 to obtain the two AR-style rifles.

d.   After SOLIS departed in SUBJECT VEHICLE 1 to retrieve the Kimber and Sig Sauer pistols at approximately 1:52 PM, SOLIS made very brief stops at SUBJECT PREMISES 2 and SUBJECT PREMISES 3 before he returned to SUBJECT PREMISES 1.

e.   When SOLIS arrived back at SUBJECT PREMISES 1 at approximately 2:05 PM, he sold the Kimber and Sig Sauer pistols to the UCs.

**O.   Controlled Transaction #12: SOLIS sells another AR-style short-barreled rifle to UCs on January 5, 2023**

102. After departing the meeting location, at approximately 2:19 PM, UC-2 asked SOLIS via text message if SOLIS would sell the third AR-style firearm to the UCs for $2,200.  SOLIS agreed and stated that he could get the AR-style firearm from the "same dude that just built both and sig u took," which I interpreted to mean that source of the third AR-style firearm was the same person who earlier provided the two short-barreled AR-style rifles and the Sig Sauer pistol.  UC-2 replied that he/she would let SOLIS know when the UCs were close by.  SOLIS replied at approximately 2:24 PM, "Ok [c]ool sounds good."

103. Based on my review of pen register data, the next call or SMS activity with the SUBJECT DEVICE's number was an outgoing phone call to the 7887 number at approximately 2:33 PM, and an outgoing phone call to another number at approximately 2:39 PM.

104. According to surveillance reports, SOLIS arrived at SUBJECT PREMISES 3 in SUBJECT VEHICLE 1 at about 2:39 PM.  SOLIS got out of SUBJECT VEHICLE 1 and approached SUBJECT PREMISES 3 on foot, walking through the driveway gate and out of view. Approximately less than a minute later, SOLIS emerged and walked away northbound on S Willowbrook Avenue and out of sight.

105. At approximately 2:50 PM, UC-2 called SOLIS and stated that UC-2 was dropping off the firearms the UCs had just

purchased from SOLIS.  UC-2 offered to meet SOLIS again to purchase the third AR-style firearm.  SOLIS agreed, stating he was "gettin' a burger around the corner," and that he was "in the area."  In the interest of time, UC-2 offered to meet SOLIS wherever he was going to retrieve the firearm from, but SOLIS declined, stating, "I already told him I'm picking it up." SOLIS added that he was going to finish his burger, retrieve the firearm, and "have it at the house," which, based on SOLIS's activity earlier that day, I understood to refer to SUBJECT PREMISES 1.  UC-2 and SOLIS agreed to meet outside SUBJECT PREMISES 1 in approximately twenty minutes.

106. Following the phone call with UC-2, the SUBJECT DEVICE's number dialed the 7887 number two more times at approximately 2:56 PM and 3:02 PM.  At approximately 3:03 PM, UC-2 texted SOLIS that UC-2 was five minutes away. Approximately one minute later, surveillance units observed SUBJECT VEHICLE 1 departing SUBJECT PREMISES 3.

107. SOLIS replied at approximately 3:05 PM, "Ok I'm here." At approximately 3:12 PM, the UCs arrived and parked in front of SUBECT PREMISES 1, and UC-2 called SOLIS to let him know that they were there.  Moments later, SOLIS emerged from the pedestrian gate on the west side of SUBJECT PREMISES 1, carrying a black garbage bag.  SOLIS told the UCs that the source who manufactured the first two short-barreled rifles had made this third rifle at the same time.  UC-2 paid SOLIS $2,200 for the short-barreled rifle.  The meeting concluded at approximately

3:17 PM, and SOLIS walked back towards the pedestrian gate at SUBJECT PREMISES 1.

108. Upon later examination by ATF agents, the firearm purchased was determined to be a privately manufactured, 5.56x45mm caliber rifle with a barrel less than 16 inches in length, namely, approximately 7.625 inches, bearing no serial number.

**P.    SOLIS Continues to Use the SUBJECT DEVICE and the SUBJECT ACCOUNT to advertise firearms for sale**

109. SOLIS has continued to advertise firearms on the SUBJECT ACCOUNT, which UC-2 monitors.  Following the most recent transactions on January 5, 2023, SOLIS has contacted the UC with more firearms for sale.  On or about January 24, 2023, SOLIS sent UC-2 several photos from the SUBJECT DEVICE's number depicting AR-style firearms, stating they were all available for sale.  Similar photos of AR-style firearms were also posted to the SUBJECT ACCOUNT the next day.

110. On February 11, 2023, SOLIS sent UC-2 more photos from the SUBJECT DEVICE's number depicting three FN Herstal pistols. SOLIS stated, "FNs just landed lmk," followed by prices for different calibers: a 5.7x28mm pistol for $3,000, a .45 caliber pistol for $2,500, and a 9mm pistol for $2,000.

111. Based on these recent communications and observations, SOLIS appears to continue to use the SUBJECT DEVICE and the SUBJECT ACCOUNT to facilitate unlicensed firearms sales.

**Q.  Recent Surveillance of SOLIS, MONTES, and the SUBJECT PREMISES**

112. Following the most recent controlled transaction on January 5, 2023, ATF agents and Los Angeles Police Department ("LAPD") officers have conducted surveillance at SUBJECT PREMISES 1, 2, and 3.

a.  On February 1, 2023, SOLIS was observed entering and exiting the front door of SUBJECT PREMISES 1 multiple times during early morning hours, including once to throw away trash. According to phone location data, the SUBJECT DEVICE has been in close proximity to SUBJECT PREMISES 1 during the early morning hours from February 8, 2023, to February 15, 2023.

b.  On February 6, 2023, MONTES was observed at SUBJECT PREMISES 2 at approximately 7:48 AM and later departed with a child.  On the morning of February 13, 2023, I observed SUBJECT VEHICLE 2 parked outside of SUBJECT PREMISES 2.

c.  According to queries in government and commercial databases conducted on February 14, 2023, two individuals, E.G. and E.R.G., appear to reside at SUBJECT PREMISES 3.  E.R.G.'s criminal history records indicate he has felony arrests for robbery and receiving stolen property, and a felony conviction for willful discharge of a firearm.  According to DMV records, E.G. and E.R.G.'s address of record is SUBJECT PREMISES 3. According to surveillance, before the first firearms transaction on January 5, 2023, a maroon Chevrolet pickup truck bearing CA license plate 87997J3 was observed pulling into the driveway of SUBJECT PREMISES 3.  As of February 15, 2023, this vehicle is

registered to E.R.G. at SUBJECT PREMISES 3.  On January 31, 2023, E.G. was observed exiting SUBJECT PREMISES 3 and moving a maroon Chevrolet pickup truck.

### R.    SOLIS does not have a Federal Firearms License

113. Based on my training and experience, a Federal Firearms License ("FFL") is required to engage in the business of dealing in firearms.  Under the National Firearms Act, certain firearms and other items must also be registered with ATF in the National Firearms Registration and Transfer Record ("NFRTR").  As defined in 26 U.S.C. § 5845, firearms and items requiring registration include short-barreled rifles and firearm silencers.

114. In or around mid-September 2022 and again in mid-February 2023, ATF Industry Operations Investigators (IOI) queried the Federal Licensing System ("FLS") database, which is used to track the issuance of FFLs, and the NFRTR to determine if SOLIS or MONTES have ever had an FFL, or registered any items in the NFRTR.  According to these queries, neither SOLIS nor MONTES have an FFL or any items registered in the NFRTR.

### V.  TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

115. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.    Persons who manufacture, possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their

residence or vehicles, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices on their person and in backpacks or purses in their vicinity.

    b.    Persons who manufacture, possess, purchase, or sell firearms often keep their firearms and any associated manufacturing equipment in their residence or vehicles, or in places that are readily accessible, and under their physical control, such as stash houses.

    c.    Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

    d.    Those who illegally manufacture or possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of

firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale.  In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

e.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[20]

116. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained

---

[20] As used herein, the term "digital device" includes the SUBJECT DEVICE and any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

      b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

117. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

118. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress Moises SOLIS's and Alejandro Almaguer

49

MONTES's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of Moises SOLIS's and Alejandro Almaguer MONTES's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

119. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. **CONCLUSION**

120. For all of the reasons described above, there is probable cause to believe that SOLIS has committed a violation of 18 U.S.C. § 922(a)(1)(A) (Engaging in the Business of Dealing in Firearms Without a License).  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the locations described in Attachments A-1, A-2, A-3, A-4, A-5, A-6, A-7, and A-8.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 15th day of
February 2023.

_____
THE HONORABLE MARIA A. AUDERO
UNITED STATES MAGISTRATE JUDGE